Thank you, Your Honor, and may it please the Court. My client, Philip Swaby, pleaded guilty to a crime that clearly required him to be deported from this country, but neither his lawyer nor the trial court warned him that he was doing so. Mr. Swaby was therefore entitled to relief based on two established precedents. First, the Supreme Court held in Padilla that where it is clear that a guilty plea will lead to a particular immigration consequence, a lawyer must identify that consequence for his client. And this Court has already held in Akinsati that if, as in this case, the lawyer fails to give that advice, the only type of warning from a trial court that can cure the lawyer's error is a specific and unequivocal warning that the defendant will face mandatory deportation if he pleads guilty. Now the government- Where did you get that from? You've got to have that specific warning. You've got a case that says that? Philip Swaby Yes, Your Honor. The Akinsati case itself says that the warning should be specific and unequivocal in order to correct the lawyer's error. And the government on appeal is simply ignoring the key passages and the holdings of those two cases. And under the rule that they establish, this case is not close. So Mr. Swaby's attorney told him at most that he faced a risk of deportation, and the trial court similarly said at the plea hearing that there may be some risk here. As a result, just like Mr. Akinsati, Mr. Swaby had no way of knowing that deportation was in fact a plea. So we believe that those clear rules established that there was deficient advice and that the trial court did not cure the error. And the only remaining issue in this case, Your Honors, is whether it would have been reasonable, rational for Mr. Swaby to reject this plea agreement if he knew it guaranteed his deportation. What about the issue of whether he was in custody or not, and whether a writ of moral novice is a proper way for this to be considered? Yes, Your Honor. So we believe and would like to clarify that the relevant question is whether he was in custody when he filed his petition. And the answer to that is yes, he was in custody because he was on supervised release and had not yet been deported. But the reason that's not a problem here is, well, there are two reasons. So the first is that the government's argument is that he should have filed a 2255 motion. He did in fact later file a 2255 motion. He's appealed the denial of both, and both cases are before this court. But the technically proper and easiest way to resolve this would, I would suggest, just be to treat his initial filing as a 2255 motion. This court has well-established authority to recharacterize a motion that was simply mislabeled as this one was. So what should we do? We should treat this as a 2255 and not go writ of moral novice? Yes, Your Honor. We think that essentially regardless of whether he is currently in custody, the court has well-established authority to treat his moral novice petition as a 2255, or you can simply treat his pro se 2255 as a 2255 as he filed it. Wasn't he still on supervised release when he filed the initial petition? Yes, Your Honor. And that's why he was in custody. And I'm just hoping to clarify that I do believe it should have been labeled as a 2255, but there's no practical difference. Was he pro se at the time? He was represented for his petition for writ of moral novice, and then he filed his 2255 pro se and filed both of his appeals pro se. So where we are here is that the only way there would be a problem here is if this court had no authority to treat either of his filings as a 2255 motion. And I can't quite sort out why the government thinks that would be the case. The only other obstacle would be issuing a certificate of appealability, and both this rules and the Supreme Court and this court in the Reed case make clear that you can treat his notice of appeal as a request for a certificate and simply rule on the merits. That's the simplest way to do it, don't you agree? Yes, Your Honor. So I don't believe there's any serious objection to jurisdiction here. And the final point I was going to make with respect to the merits is this question of whether he could have rationally rejected the plea agreement. And at the outset, I just want to note that Mr. Swabee made this argument in the district court, and in the district court's briefs, district court briefs, the government did not object to relief on this basis. They never said it would have been irrational for Mr. Swabee to reject the plea agreement. Your whole case, I know we'll probably hear from you quite a bit more, but it really is just about if we decide that this is, we have jurisdiction on it, that the Arkansas case, particularly the footnotes there, controls this case. Absolutely, Your Honor. And therefore, because these were just general type admonitions and not specific, that's it. That is it, Your Honor. You've got to do a lot of filling in right now to take up some time, but go ahead and tell the rest of it. Well, I certainly don't want to waste the court's time. No, I'm not saying you, I'm just, that's my perspective. So go forward. I'm certainly happy to address questions about Arkansas and whether the trial court was correct. That it had cured the error. We think that that was clearly wrong. And just proceeding to the I think you're very familiar with Arkansas. Yes, and on the question of whether it would have been rational to reject the plea agreement, we believe that the court could find that waived, but it's also very clear that it would have been very rational for Mr. Swabee to contest the government's evidence of actual loss, which is what counts, because they had very little, if any, evidence of that. And it's quite clear that if his attorney had thought that the loss amount mattered, he would have been able to explain that it was in everyone's interest to have a loss amount under $10,000. And I'd just like to briefly spell that out because Mr. Swabee's incentives, of course, go without saying. It's very well documented. Even the prosecutor agreed that his concern for deportation drove this. He's already been deported, correct? Yes, Your Honor. He was deported in, yes. Right. So how is it this whole thing not moot? What can we do now? So vacating this conviction, Your Honor, is the first step to unwinding Mr. Swabee's removal order. So this case is very much not moot. I believe cases like this are adjudicated frequently, and it is the necessary first step for Mr. Swabee to return to the country. Currently, if he's designated an aggravated felon, he can never return to his family in the United States. So there is no... If he unwound the plea agreement, he'd be returning to the country to go to trial. Yes. He would be able to attempt to negotiate a better plea agreement or go to trial. And on the plea agreement piece of that, there's one important data point that I'd like to point out, which is that his co-defendant, his wife, was charged with this exact same crime. And she pled guilty, and her ultimate sentence was zero jail time, zero restitution. She was given three years of probation and a $100 fine. Did she have a different lawyer? She certainly did, Your Honor. And we think... She probably could have used that one. We believe that that is a good data point to see what a competent attorney would have done for Mr. Swabee. He certainly could have gotten the loss amount under $10,000. The government was on the same side in both cases. They could have seen that the right thing was done. Yes, Your Honor. And particularly, if anyone had realized that he would be deported if this loss amount went higher, we think there clearly would have been a different outcome. And just very briefly on the rationality of going to trial, in case my friend contests this, what matters for restitution and for this immigration provision is actual losses. The primary thing the government has always pointed to in this case are the 2,000 labels they found in Mr. Swabee's house. Now, labels on Mr. Swabee's counter are not causing loss to anyone, but the government would have to show if Mr. Swabee's attorney had thought to challenge this was first that there were actual sales of these counterfeit goods, and then they would have to prove that somehow these sales at Mr. Swabee's store were causing actual losses to companies like Gucci and Louis Vuitton by diverting sales from them. And all we need to show here is that it would have been difficult that Mr. Swabee had a reasonable probability of making out that argument. And like the other issues in this case, we don't think that issue is close. Absent any further questions, I'm happy to reserve the balance of my time.  Mr. Zielinski? Thank you, Your Honor. My name is Aaron Zielinski. I represent the United States. The logical starting point in this case, as opposing counsel just indicated, is the procedural posture here. I think there's a concession this is not properly seen by the court as a 1651 petition. Just to flesh that out a little bit, the government has particular concern over the scope of 1651 because unlike 2255, which is limited to those defendants in custody Do you agree that it's a 2255 type case? I do agree, Your Honor, that this court could grant the certificate of appealability and could treat the 1651 as a 2255. I think there are reasons not to do so. The most critical reason is the one that was brought up at the end of the argument just now. There isn't very much information available regarding the loss amounts and the arguments that would have been made in the district court record below because the district court did not receive evidence or, frankly, hear very much in the way of any argument on this matter. You'd have to go back and start over. Well, a remand, that is what the government proposes. A remand, Mr. Swabie would be able to file a 2255 and proceed in the regular fashion in the district court. In that case, the district court would be able to engage in the record-intensive inquiry into determining whether or not there was, in fact, the loss amount that could have been proven. It's the government's position the loss amount could well have been proven in this case. But the record below is not clear. So, does that mean you also concede that the advice given here and the instruction given here by not just Mr. Swabie's attorney but by the court and by the government, which is difficult to understand, was incorrect? The advice that he would not be deported or may not be deported was incorrect? So, Judge Zachar, I think that that question, you've put your finger on a critical difference in the advice that was given. The district court found that what Mr. Ward gave, that is a JA-121, and the district court opinion said, in essence, that Mr. Swabie's plea would not trigger deportation. That's the first thing that Judge Quarles found. And second, that pleading guilty under A-1 would reduce the risk of deportation because it wouldn't involve deceit. The government does believe that that advice that was given by Mr. Ward, as the district court found, that is, that Mr. Swabie's plea would not trigger deportation, was incorrect. There is no doubt that that was ineffective. Then are we fighting about anything? So why doesn't the government just agree to this relief? Because the issue is whether or not Judge Quarles' finding that there was no prejudice because of the curative instructions was correct. Where is he now? Mr. Swabie is in Jamaica, Your Honor. Is that not prejudicial? Where is his wife? The prejudice is not that it resulted... Were they split up because of this? Is she still here? Ms. Robinson is still here, I believe. I can't say in the record for her current location. Your Honor, the prejudice that resulted here isn't the deportation. Of course, the government does believe that deportation resulted. You're saying that Judge Quarles' statement that this may result in deportation or may mean that you'll be removed or may be of a risk is a cure. Combined with his... You've got to read Arkansas and distinguish that and that footnote there to get there because that looks pretty clear to me. May won't do it. Well, Your Honor, this court obviously, as the panel indicated, is well-versed in Arkansas. The government believes the critical part of Arkansas can be located in its site to Hernandez-Monreal. In Arkansas, at 253 in Arkansas, the Arkansas court cited Hernandez-Monreal in a positive light, approvingly, and said that was a case finding the defendant was not prejudiced by counsel's failure to advise of deportation consequences when during his Rule 11, the defendant, quote, affirmatively acknowledges understanding that the plea could definitely make it difficult, if not impossible, for him to successfully stay in the United States. But here what we have is a defendant who clearly is doing everything he can to keep from being deported. And he's facing a charge that if he pleads, he is going to be deported. I mean, that's the difference here. This is not a could or may. He will be. And his counsel has advised him wrongly. And so the judge's cure is only maybe. I mean, you say that in every case. If you get anybody, an immigrant, before you, you can get up and, I mean, that's just a general statement. You may be deported. He doesn't know that. He doesn't. If the judge had given a correct, he said, you will be. I'm looking at it right here. And this is what's going to happen. If you knew immigration law, you said you will be. That's the difference in this case. And then go to those footnotes in Arkansas, which seem to be a little bit more direct on point here, don't they? Well, respectfully, Your Honor, I think the body of Arkansas that cites Hernandez-Monreal, which is a Fourth Circuit case. It's at 404 Federal Appendix 714, is the most controlling thing that the court said. That case where the court approvingly cited as a corrective that could be given by a district court in Arkansas. So Arkansas cited that there could be a corrective given if improper advice was given by counsel. It approvingly cited Hernandez-Monreal. That case also involved a mandatory deportation case. Hernandez-Monreal involved an aggravated felony. And what is the improper advice here? The improper advice that Mr. Ward gave was what Judge Quarles found it to be, that he would not be deported if he pled guilty and received under 364 days. When, in fact, the law is that he would be deported. I'm sorry, Judge Thackeray. When, in fact, the law is that he would be deported. That's correct. So how does may be equate to would be? How does that cure anything? Well, so the question is whether or not there's prejudice. In this case, the defendant had, to distinguish Arkansas, to start where Judge Wynn properly said, this is a case that has Arkansas's fingerprints or progeny on it. There are a number of different ways this case is different from Arkansas. The first thing is, Arkansas pointed out in a footnote it did not contain a plea agreement that had anything to say on the matter. In this case, in fact, the defendant said that he pled in his plea agreement regardless of any immigration consequences. That was contained in the defendant's plea agreement here. He said that he pled guilty regardless of immigration consequences. In addition, the plea agreement laid out that there was the possibility of automatic removal for a broad range of offenses. That's what the plea agreement said. There's for a broad range of offenses and that no one, including the court, can predict what the immigration consequences would be. In addition to that, as I indicated earlier, Arkansas approved of the similar kind of corrective that was given here in Hernandez-Monreal. That is, a situation where there was a plea to an offense that carried with it deportation and the court said that it could make it difficult, if not impossible, to successfully stay in the United States. That statement that Arkansas approved of at 253 as a potential curative, that you could make it difficult, if not impossible, to stay in the United States, is very similar to the court's repeated mentions that you may be deported here. In addition, Arkansas put note on the fact that the court's admonition in that context was a limited one. It occurred in a long string of possible issues that could arise. I'm having a hard time understanding where this is going, because Arkansas essentially had a situation where the trial court said to the defendant that it could lead to deportation and the court said that statement did not cure the prejudices associated with the counsel's affirmative misadvice that the defendant's crime was not categorically a deportable crime. Here, this is categorically a deportable crime and the cure you proffer is may leave. In Arkansas, it was could leave. How is that different? So, Judge Wendt, there are a number of reasons that Arkansas is distinguishable from this case because the issue is the prejudice analysis. What would the defendant have done? In the case of Arkansas, looking at the record, the court found that that one... One thing he wouldn't have done. Yes, Your Honor. He wouldn't have just pled to an offense where there's no way he wins on. I mean, I think you can pretty much figure that out, that if you got someone, he's about to plead to something that categorically is a deportable offense and he absolutely, he has a wife, two young children, he absolutely does not want to go and he's been told by the counsel to do it. He would... It just seems to me that's prejudice. I just don't think... I mean, otherwise he wouldn't be up here. Well, the issue, Your Honor, is whether... Assume, for instance, that the court had given a curative instruction that rather than say you're pleading guilty, there are a broad range of offenses that can trigger deportation or automatic removal and this is one of them. Or in shorter terms, you will be deported rather than you may be deported. I think everyone would agree that would cure prejudice. Even in spite of... Let me just make sure I understand. Are you saying that even if he did go to trial, he's still going to be deported because... And he would have lost, Your Honor, a trial. The evidence was overwhelming as Mr. Ward's affidavit points out. How do we determine that here, though? Well, that's part of the reason... The question is, I don't know about that. I don't know if he would have been or what. I don't even know if he got to plead. So I don't know. And you're only talking about a small amount of money in terms of moving into a different category. Well, I think it's important to understand two things, Judge Wynn. The first is part of the reason that the government believes this case should be properly remanded for refiling before the district court is to make exactly those kind of fact-intensive determinations that the court has just indicated. The court just said that it's difficult to make those determinations at this stage on a relatively thin record. That's because the district court did not make those determinations below and it should be given an opportunity to do so. So that's why the government respectfully requests that this court be vacated, it be sent back to the district court, and that that sort of fact-intensive inquiry be engaged in at the district court level. As to the loss amount, it's important to understand that in the same way that the court is mindful of the fact that it's looking for a plea agreement, there are cases that note that the government could have marshaled much more evidence than what's contained in the four corners of the plea agreement itself. That is, had Mr. Ockensaude gone to trial, the government would have had much more than what's contained in the plea agreement. And part of the reason the government engages in plea agreements, as this court is well aware, is to limit and conserve scarce resources. Had the government proceeded to trial there, they would have introduced much evidence that they don't make defendants admit to in the plea agreement. There were, in addition to those 2,000 marks, a confession, as the record points out. There were, on the loss amount alone... But that'll all be for if we grant petitioner relief. That would all be for petitioner to deal with and weigh and evaluate, either whether he wants to go to trial or negotiate another plea agreement. But, Your Honor, the question is, the plea agreement that's in place, the plea agreement that was entered into, the inquiry is, what would he have made the determination then to do? That analysis shouldn't just rest on the $14,000 figure, because it's easy to poke holes in the 14... It rested on his understanding of the immigration, of his immigration status. And he understood from the plea agreement, Your Honor, that he would plead guilty... The government attorney said that his understanding of the immigration implications shaped the course of the plea negotiations. That's correct. On the other hand, the government attorney below expressly would not go below the $10,000 number, which it appears Mr. Ward knew that there was at least some immigration consequences of, though he was not entirely clear on them. But, so, the government... Mr. Ward... I'm sorry, Mr. Suave's lawyer below attempted to fashion a plea that would give him coverage. He knew that the $10,000 number was important from an immigration perspective. He has given an affidavit that says that the United States would not come down below that $10,000 number. And he knew that that had an immigration consequence. Mr. Suave was then repeatedly informed in the plea agreement and in the plea colloquy that there was a real potential consequence. Did he say he knew it had? He said... Mr. Ward says... This is part of the contradictory nature of what's below, and more reason to be remanded to... Here's the affidavit you're talking about. Maybe that would... Sure, Your Honor. The affidavit that Mr. Ward gives is contained in the judicial appendix. It begins on... Mr. Ward, his attorney? His attorney below, Your Honor, yes. So it's at J.A. 146 is where it begins. There's then a... Okay, thank you. There's then a determination at J.A. 151 where he discusses, in further conversations I had with Mr. Herring, he declined to lower the loss amount below $10,000. At J.A. 150, he discusses the fact that Ms. Berlin, the immigration attorney that he retains, says... Is there any way to remove intent to deceive? And looking at another possibility, an offense that involves fraud or deceit where the loss exceeds $10,000. Could the proposed facts indicate a loss under $10,000? So there was an attempt to also move the loss amount under $10,000 because Mr. Ward was aware that it had some immigration consequences. Now, to be clear, this is a further indication of why the procedural posture of this case is unusual and warrants remand. Okay, and is that because David, he told him that under the plea agreement, he would likely be sentenced to 364 days, which would not trigger deportation? Although, as Judge Quarles points out on 151, and hoping that ICE would not invoke the raise-the-loss issue, that is an indication that, in fact, he was subjecting himself, as Ms. Berlin's comments to Ward indicate earlier, to a potential deportation because of the loss issue of over $10,000. But the more important point is, the reason that this record is relatively unclear is because the original filing below, the 1651 that was filed by Mr. Suave, with assistance of counsel, contained an affidavit that said that he had never been informed at all, had no idea of the immigration consequences. That was clearly belied by the plea colloquy that was given with the court and the plea agreement itself, which said that regardless of immigration consequences, which could include automatic removal for a broad range of offenses, that he had decided to plead guilty. In that context, the government responded in a limited matter, soliciting an affidavit from Mr. Ward at the court's direction below that noted that, in fact, they had pursued some of the immigration consequences at issue. Mr. Suave had been informed that there was a potential, both in the plea agreement and in the colloquy, and so Mr. Suave's 1651 petition rested on an affidavit that in the most charitable light could be viewed as a confused memory of what had occurred. Then the district court, assessing the affidavit that had been given in response to Mr. Suave's affidavit, noted that there had been a problem with the law that Mr. Ward had been examining. That was an issue that the district court identified on its own. It had not been identified by Mr. Suave's counsel, nor, frankly, had it been identified by the government in response. The district court then took the next step of saying, it appears that that was deficient, but I believe that there has been an appropriate prejudice that was cured by my invocation. The district court never even reached the question as to whether what Mr. Suave might have done, what he might have pled to, issues related to the loss amount. And so if this court is inclined to believe that the district court got the prejudice assessment wrong, which the government believes is clearly distinguished from Arkansas, and in fact looks much more like the case that Arkansas cited favorably, Hernandez-Monreal, where they said that a plea could make it difficult, if not impossible, to successfully stay in the United States. And this court cited that approvingly in Arkansas. If the court does believe that this case is comparable to Arkansas, then the record is sufficiently imprecise that it should be remanded and vacated, both because the procedural posture of the case is unusual, and also because it would give the district court adequate time to develop a factual and full record for further review at a later time. But the important thing here is this case is clearly distinguishable from Arkansas. First of all, as I pointed out, the statement here was not buried within a string. It was clear and direct and repeated. Second of all, there was a plea agreement where the defendant said that he would plead guilty regardless of the deportation consequences, and he was notified that a broad variety of offenses could trigger automatic deportation, including felonies under the United States. Third, the fact that Arkansas favorably cited exactly a corrective that the district court found when it was repeatedly given here. Arkansas favorably cited the corrective that a defendant was told that it could definitely make it difficult, if not impossible, for him to successfully stay in the United States. That was the corrective Arkansas cited in the text at 253, and that corrective was in the case that Arkansas was citing, Hernandez-Monreal, was a case that involved a mandatory deportation offense. So Arkansas left open the possibility that a sufficient corrective where you could end up getting deported as a result of this would suffice to cure prejudice. The question is were the repeated correctives in this circumstance, on multiple occasions by the district court, coupled with a plea agreement that specified, as it did not in Arkansas, that regardless of the immigration consequences, the defendant chose to plead guilty, coupled with the fact that it was very clear and apparent that the district court went through multiple times, not buried in a string, but multiple times talking about it. The information that the defendant's counsel told him he wouldn't be deported. Your Honor, the information that the defendant's counsel gave him telling him he wouldn't be deported It is. But the other criteria are the reason It says quite clearly, could leave but would not cure that deficient advice. Respectfully, Your Honor, at 253 the court says just the opposite. They say finding, they cite Hernandez-Monreal favorably, and It's not a published case? But the court in Arkansas cites it as an example of the district court. I think it's published. It's used for guidance. It doesn't make it precedent. That is correct. Hernandez-Monreal is not a published case, but Arkansas' determination that that is a curative instruction makes it used as precedent. Arkansas quotes it. I see my time is up. So if there are no further questions. All right. Thank you. Garcia? Thank you, Your Honor. A few points here. It appears we're not arguing about very much. The government has conceded the jurisdictional issue. They've conceded deficient advice. They haven't conceded that the trial court did not cure the error, but all that the court needs to say is that nobody told Mr. Swabee that he would face mandatory deportation. No one told him that. The plea agreement, which my friend references, also did not say that. It said that some crimes can lead to deportation. Paragraph 4H of the plea agreement, though, does say removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the court, can predict with certainty the effect of a conviction on immigration status. So what's your response to that? Yes, Your Honor. My response to that is that under Padilla, it's clear that when the consequence of the plea is clear, it is the Sixth Amendment duty of the counsel to tell him what consequence he faces. And a statement like that, which is generic and unrelated to the facts of this case, would only prompt Mr. Swabee to go and have a conversation with his lawyer, just like he did, and his lawyer misled him. The plea agreement could equally well have said some federal crimes lead to deportation, some federal crimes lead to the death penalty. Both of those statements are correct, and both of them would simply have prompted him to talk with his attorney. Now, what the government's primary argument is on the rationality of rejecting the plea. At one point, they referenced Mr. Ward's statement in his affidavit that he tried to have the loss amount lowered. It is 100 percent clear that even if that conversation occurred, he did not think it mattered. On J.A. 83, at the sentencing hearing, after all of this had happened, Mr. Ward said in open court that he believed this plea agreement would avoid deportation. So, it's a rather remarkable statement. It confirms both his deficient performance and that it had not been cured. And the primary argument seems to be that this court can't grant relief because there isn't enough evidence in the record of actual loss and what he would have done absent that. The government had the opportunity to do that. There is no difference between a Quorum Novus petition and a 2255 motion on the merits. The question below was were his Sixth Amendment rights violated and is he entitled to relief? The government had their chance to put in evidence and they did not do it probably because there is no evidence of actual loss. We can see that he... Yes, Your Honor. I understand what the government is arguing as appropriate relief. What relief is it that you specifically want from us? We want you to grant Mr. Swabee's 2255 motion and vacate his conviction. There is no need for a remand. The government had their chance and Mr. Swabee is clearly entitled to relief. The big picture here, Your Honor, is that it is unambiguously clear that my client was doing everything he could to avoid deportation. He even accepted a sentence at the very top of his guidelines so that he would be able to avoid deportation because his lawyer told him specifically that that would help him avoid deportation. His lawyer was wrong and he not only got 364 days in jail, he's been removed from the country and his two children for the rest of his life because his lawyer didn't check which statute he was charged under or challenge the amount of loss in any way. The conviction should be vacated now. Why wouldn't the only remedy simply be to set aside the plea agreement? Yes, so we would be vacating the conviction, setting aside the plea agreement and allowing the government if they want, they can try to put on this evidence. Thank you very much. Thank you so much. Mr. Garcia, we know that you're a court opponent. The court wants to make a special thanks to you and without your work we couldn't do our job. We appreciate that. And also, Mr. Zelinsky Zelinsky also notes your able representation of the United States. Alright, we will ask the clerk to adjourn.
judges: Roger L. Gregory, James A. Wynn, Jr., Stephanie D. Thacker